# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 6, 2009

## STATE OF TENNESSEE v. NEIL THOMPSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 06-08055     James C. Beasley, Jr., Judge**

---

**No. W2008-00311-CCA-R3-CD  - Filed April 17, 2009**

---

The defendant, Neil Thompson, was convicted by a Shelby County Criminal Court jury of robbery and sentenced to three years, suspended after service of six months, followed by three years of probation.  He appeals, arguing:  (1) the trial court erred in failing to grant a mistrial due to a tainted jury, (2) the trial court erred in admitting a copy of the victim's telephone records into evidence, (3) the evidence is insufficient to sustain his conviction, (4) the trial court imposed an excessive sentence, and (5) he is entitled to relief due to cumulative error.  After our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which J.C. MCLIN and CAMILLE R. MCMULLEN, JJ., joined.

Robert Jones, Shelby County Public Defender; Phyllis Aluko, Assistant Public Defender (on appeal); and Timothy Albers, Assistant Public Defender (at trial), for the appellant, Neil Thompson.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; and Damon Griffin, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The defendant and a co-defendant, Tommie Simmons, were indicted for the May 2006 robbery of Angel Barrois.  At the December 2007 trial, the victim testified that on May 20, 2006, she and her husband drove to Memphis from their home in Hammond, Louisiana, to visit her in-laws who had moved to Memphis the previous month.  They arrived shortly after midnight and went to a restaurant on Beale Street with her two brothers-in-law and sisters-in-law.  Close to 2:00 a.m., the victim and her sisters-in-law, Zoe and Nicole Barrois, left the restaurant to return to her in-laws'

apartment, which was "a couple of blocks" from the stadium. As they walked along, she noticed two men walking, who kept crossing the street back and forth, "a few feet" ahead of them.

When they were about a block from the apartment, one of the men, the defendant, turned around and grabbed the strap of the victim's purse "with his left arm, and he had his right hand under his shirt, and he told [her] he wanted [her] purse." The victim bent her arm and asked the defendant if he was joking, to which he replied, "[Y]es, but he was F'ing serious and that he had a gun." The defendant pulled her purse harder, straining her arm, and her sisters-in-law screamed. The two men then "took off running down the street" with her purse. She said that the co-defendant stood behind and to the left of the defendant on the sidewalk during the altercation.

After the incident, the victim and her sisters-in-law ran to the lobby of the apartment and called the police. An officer came to the apartment and took her statement. The victim and her husband stayed in Memphis one more night and then returned to Louisiana. Once she was home, Sergeant Hopkins with the Memphis Police Department contacted her, and she reported some of the items that were stolen along with her purse, including credit cards, her checkbook, driver's license, and cell phone. The victim related that the robbery had affected her because "[her] identity was stolen," and she still cannot write checks in many places "[b]ecause checks were written all over Memphis." However, none of her credit cards were used.

The victim testified that she cancelled her cell phone later the morning of the incident before returning to Louisiana, but her phone bill reflected twenty minutes worth of calls to an unfamiliar Memphis number that were placed after her phone had been stolen but before she canceled her phone. After she was issued a new phone with the same phone number, she received a call from a Memphis number she did not recognize. She called the number back and the young-sounding male who answered the phone hung up on her. She faxed Sergeant Hopkins a copy of her cell phone records on May 30, 2006, and informed him of the call she received from an unfamiliar number, 901-649-8618, and the unfamiliar number that appeared on her bill, 901-358-5760.

The victim stated that she described the man who robbed her to Sergeant Hopkins as "young, slim, medium complected, African American, dark eyes, dark hair, short." Sergeant Hopkins emailed her two photographic arrays, each with six photographs, and out of one lineup she identified the defendant "[v]ery quickly" as the man who robbed her. She printed the line-up, circled the defendant's photograph, signed it, and faxed it to the officer. She also mailed him her original copy. The victim was unable to identify anyone from the second array. She said that she did not discuss anything relating to the photographic identifications with her sisters-in-law. The victim also identified the defendant in a lineup for the preliminary hearing.

Asked if she noticed any distinguishing features about the man who robbed her, the victim said that in addition to his race, she noticed "his facial features, the fullness of his lips, that his ears poked out a little bit, he had very short hair, his size, his build, his physical frame." She acknowledged that right after the robbery she gave "an average description" of the robber but

explained that she was not asked to give a specific description. The victim stated that she never told Sergeant Hopkins that she was not going to be able to identify the robbers.

Zoe Barrois, the victim's sister-in-law, testified that she and her husband lived in Memphis on May 19, 2006, having just moved there the previous month. On that date, her husband's brother, Donnie, and his wife, Nicole, arrived from Thibodaux, Louisiana, around 3:00 or 4:00 p.m. Her husband's other brother, Darren, and his wife, the victim, arrived around midnight. The family was in town visiting for "the barbeque cook-off." Around 1:00 a.m., everyone, except Donnie, walked to the Blues City Café for dinner. After dinner, the three women decided to walk back to the apartment; the victim was walking in the middle of the other two. As they walked along, Zoe[1] noticed "two guys lingering, kind of crossing the street," which she did not think odd at first. Zoe recalled that Nicole indicated that they needed to slow down, but "by then it was too late. [The two men] had stopped walking."

Zoe testified that one of the men, the defendant, said he had a gun and told the victim he wanted her purse. The victim replied, "You're kidding, right?" The defendant responded, "No, I'm not kidding, I have a gun, give me your purse." The victim tried to hold her arm, but the defendant ripped her purse off her arm and took off running. The women ran back to the apartment courtyard and called 911. The police arrived, and Zoe described the robber as having ears that poked out and the other man as having hair in "little rows [with] . . . some little extra ponytail-like rows in the back." Zoe recalled that the defendant told them twice that he had a gun, and she saw "an image of a weapon" under his shirt. The second man, the co-defendant, "kind of walked out to the middle of the street" after the defendant demanded the victim's purse. Zoe said she was sure the defendant was the man who took the victim's purse "[b]ecause we were face to face. And, from that day on, if I close my eyes, I can re-live it minute by minute."

Zoe testified that about ten days after the incident, she went to the police department to view photographic arrays. From the arrays, Zoe identified the defendant as the robber and the co-defendant as the second man. She said she was "absolutely sure" of her identifications, and she did not talk to or visit with the victim before making the identifications. Zoe also attended a preliminary hearing sometime in 2006 at which she identified the individuals as well. She said that she and her husband moved from Memphis approximately two months after the robbery because she "was afraid to leave [her] apartment. [She] was afraid to walk on the street."

Sergeant Don Hopkins testified that he investigated the robbery in this case. Sergeant Hopkins took a statement from the victim by telephone, and the victim also contacted him to inform him that "her [cell] phone had been used by someone other than herself or called by people that she did not know." The victim faxed him a document on which she had circled Memphis telephone numbers that she had no knowledge of calling, and he called the numbers and explained what had taken place to the people who answered. In doing this, Sergeant Hopkins spoke to the co-defendant's mother and father. He asked them to bring the co-defendant to the police station because

---

[1] To prevent confusion, we will refer to some witnesses by first name when necessary.

he matched the general description of one of the individuals involved in the robbery. One of the numbers Sergeant Hopkins called, 901-358-5760, was the home phone of the co-defendant's parents, and the other number, 901-649-8618, was the co-defendant's father's cell phone.

Sergeant Hopkins initially sent officers to the co-defendant's parents' home, and then later the co-defendant's father brought him to the police station. The co-defendant "did not talk in detail," but Sergeant Hopkins discovered that someone known as "Main Man" had been staying with the co-defendant. Sergeant Hopkins called the co-defendant's mother, and she identified "Main Man" as the defendant. The co-defendant was arrested after the interview.

Sergeant Hopkins created photographic arrays that included the defendant's and co-defendant's pictures and emailed them to the victim in Louisiana. He spoke to the victim before emailing the arrays and explained the identification process to her. The victim identified the defendant from one of the arrays and faxed it back to him immediately. He also emailed the arrays to the victim's sister-in-law, Nicole, who was also in Louisiana, and she identified one of the suspects.[2] Sergeant Hopkins had Zoe Barrois view the arrays at the police station, and she identified both the defendant and co-defendant.

Sergeant Hopkins acknowledged that the supplemental offense report relayed that the victim told him on May 29, 2006, that she would not be able to identify any suspects. Sergeant Hopkins noted that his report indicated that Zoe was visiting the victim in Louisiana when he called her on May 31, 2006. Sergeant Hopkins said that he questioned the defendant but did not take a formal statement even though the defendant was willing to talk to him. He explained that was because the police typically do not reduce it to writing when someone denies being a part of a crime.

Testifying on behalf of the co-defendant, Natosha Ingram stated that she was dating the co-defendant on May 20, 2006. Looking at the phone records for the co-defendant's parents' home, Ingram acknowledged that her cell phone received a call from that number at 12:07 a.m. on May 20, 2006, and the call lasted 57 minutes and 22 seconds. Ingram initially said that she did not remember talking to the co-defendant that day, then she said that she did remember talking to him but did not see him. After the prosecutor played a recording of a conversation between Ingram and an investigator, Ingram admitted that she told the investigator that the co-defendant was at her house that night.

Starkeasha Simmons, the co-defendant's sister, testified that she was dating Terez Hawkins in May 2006. She stated that the phone number 901-521-9946 was the number for Hawkins' mother.

Gwendolyn Hawkins, the co-defendant's mother, testified that she learned her son was a suspect in a robbery on May 31, 2006, when Sergeant Hopkins called her. The robbery allegedly took place on May 20, 2006, but she said her son was not involved because he was home at the time. She recalled that the co-defendant came home around 10:30 p.m. and was at the house when she

---

[2] The record does not indicate which suspect she identified.

went to bed at 1:00 a.m. When she woke up at 2:09 a.m., the co-defendant's shoes were at the house and he was on the phone. He was at the house when she woke up later that morning at 6:30 a.m.

Tommie Hawkins, Sr., the co-defendant's father, testified that he learned his son was a suspect in a robbery when two police cars arrived at the house looking for him. They asked to see the co-defendant but did not tell him why at that time. The officers came back a second time and asked that he call Sergeant Hopkins when the co-defendant returned. Mr. Hawkins called Sergeant Hopkins and agreed to bring the co-defendant to the police station, which he did on May 31, 2006. At the station, Sergeant Hopkins met with the co-defendant for approximately thirty minutes, and the co-defendant was then placed under arrest for robbing three women. Mr. Hawkins said that his son was at home at the time of the robbery. He acknowledged that one of the numbers on the victim's cell phone record, 901-358-5760, was his old home number and that 901-649-8618 was his cell phone number. He stated that the defendant is his nephew.

The co-defendant testified that his father took him to the police station on May 31, 2006, and he told the officers that he was asleep at home on May 20, 2006, at 2:00 a.m. He recalled that he talked to Natosha Ingram on the phone that night from around midnight until 1:00 a.m., then his friend Erica Norman called at 1:30 a.m. and they talked until around 2:00 a.m. He said he was not downtown that night and was at home the next morning. The co-defendant identified Ingram's phone number on his parents' home phone records. He said his interview with the officers lasted less than ten minutes.

Tawana Thompson, the defendant's mother, testified that the defendant was asleep in bed at home at 6:00 a.m. on May 20, 2006. She saw the defendant the night before at 11:00 or 11:30 p.m. when he "went upstairs to his room." She said that the defendant could not have left the house because the door was locked and the keys were in her purse.

The defendant testified that he was at home on May 19, 2006, from around 3:00 or 4:00 p.m. until the next day. He said he did not go downtown that evening and denied any involvement in the robbery.

After the conclusion of the proof, the jury returned a verdict of guilty as to the defendant and not guilty as to the co-defendant. The defendant appealed.

## ANALYSIS

### I. Jury Taint

The defendant argues that the trial court erred in failing to grant a mistrial after a juror reported feeling uneasy at seeing the defendant and co-defendant not in custody. The defendant argues that the juror's level of fear "demonstrates an undercutting of the presumption of innocence" and that her fear was communicated to other jurors increases the level of harm to his right to trial by

an impartial jury. The State responds that the trial court did not abuse its discretion because no manifest necessity existed for a mistrial. We agree with the State.

Whether to declare a mistrial lies within the sound discretion of the trial court, and its decision in this regard will not be overturned on appeal absent a showing of an abuse of discretion. State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. See id. (citing State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994)); State v. Jones, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999) (citing Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting Arnold, 563 S.W.2d at 794). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. Land, 34 S.W.3d at 527 (citing State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)).

The second day of trial, it was brought to the trial court's attention that one juror had reported feeling uncomfortable at seeing the defendant and/or co-defendant in the lobby "or standing around somewhere." The court questioned the juror, and she reported that neither of the individuals said anything to her – it was "[j]ust that [she] felt uncomfortable." She explained, "It's just the fact that it's not comfortable knowing that you're a juror on a trial, and just seeing them in your presence." Nevertheless, she maintained that her discomfort would not affect her ability to make a decision in the case. She admitted that she told three other jurors of her discomfort. The court questioned those jurors, and they confirmed that the first juror had reported feeling uncomfortable at seeing the defendants out on bond. Each of the three jurors affirmed that the first juror's feelings would not affect their ability to decide the case. After the defendant and co-defendant moved for a mistrial, the court decided to excuse the first juror out of "an abundance of precaution" but denied the motion for mistrial. The court explained its reasoning as follows:

> Because she said something to the other three. My observations from those three who came in here, was, that she just expressed some concern about seeing the defendants out there and being uncomfortable.
>
> It did not seem that the other three were phased by that or expressed any concern or indicated any problems with that.
>
> And, I will bring the jury in and give them instructions, again, about the fact that the defendants are on bond, they're allowed to be on bond, they're not allowed to have any contact or communication with any of the jurors or jurors with them.

There was no proof of any improper actions by the defendant or co-defendant that may have caused the first juror to feel uncomfortable. The juror who expressed discomfort maintained that she could still render an impartial verdict but was excused from the jury anyway "out of . . . an

abundance of precaution." The trial court questioned the three jurors who had heard of the first juror's discomfort, and each acknowledged that the defendant and co-defendant had a right to be on bond and verified that they could still render an impartial verdict. The trial court then gave a thorough curative instruction to the remaining jurors, informing them that the defendant and co-defendant were lawfully out on bond. We conclude that the trial court did not abuse its discretion in determining that there was no manifest necessity for a mistrial.

## II. Telephone Records

The defendant argues that the trial court erred in allowing the State to introduce a copy of the victim's telephone records into evidence. The State responds that the trial court did not abuse its discretion.

At trial, the State sought to introduce as exhibit one a copy of the victim's cell phone records, as well as the cover page, that she faxed to Sergeant Hopkins which showed calls that were made and received from her cell phone between the time it was stolen and later deactivated. The victim explained that the first page was the cover page in which she explained to Sergeant Hopkins what she was sending, and the second page was "a printout from the cell phone company." Defense counsel objected on grounds that it was not the original copy of the bill, saying, "We don't have any way of knowing whether that's a true and accurate copy of her bill." The State explained that it was admitting the original fax, which included the cover page containing notes and writing. The court concluded that the fax was admissible because the victim identified it as the copy of the fax she sent to Sergeant Hopkins.

At the hearing on the motion for new trial, the defendant argued that the "[c]ourt erred in allowing the [S]tate to introduce exhibit one which was a copy of a phone record, hindering our ability to cross-examine the witness. We didn't have the original, nor did we have the full record . . . ." Thus, the defendant challenged the admission of the phone records on the ground argued at trial – that it was not the original, and a new ground – that it was not the entire bill. The defendant also alleges two new grounds on appeal: that the introduction of the phone records violated the rule against hearsay and his right to confrontation.

Our review is limited to the grounds asserted in the objection unless there is plain error. See State v. Adkisson, 899 S.W.2d 626, 634-635 (Tenn. Crim. App. 1994) ("[A] party is bound by the ground asserted when making an objection. The party cannot assert a new or different theory to support the objection in the motion for a new trial or in the appellate court."). "When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. Crim. P. 52(b). In State v. Smith, 24 S.W.3d 274 (Tenn. 2000), our supreme court adopted the test for plain error first announced by this court in Adkisson, 899 S.W.2d at 641-42. In order for us to find plain error, Adkisson requires that

(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

Smith, 24 S.W.3d at 282 (quoting Adkisson, 899 S.W.2d at 641-42).

A court's discretion to notice plain error is to be "sparingly exercised." State v. Bledsoe, 226 S.W.3d 349, 354 (Tenn. 2007). To justify reversal, the magnitude of the error must be so significant that it probably changed the outcome of the trial. Id. The accused has the burden of persuading an appellate court that the trial court committed plain error. Id. at 355. Consideration of all five factors is unnecessary when it is clear from the record that at least one of them cannot be satisfied. Id.

We discern no plain error. With regard to his challenge to the "fullness" of the bill, we simply fail to see what the victim's full telephone bill would have revealed that would have been of any relevance to this case. The portion of the bill entered into evidence begins with calls on May 9, 2006, ten days before the robbery, and continues through the end of that billing period, which was approximately five days after the victim's phone was deactivated. Any information pertinent to this case would have been contained on the portion of the bill entered into evidence. With regard to the defendant's hearsay and confrontation challenges, the faxed phone record arguably was not admitted to prove the truth of the matter asserted, that the calls were made, but instead to show how Sergeant Hopkins came to develop the defendant as a suspect. As such, the defendant's rights under the confrontation clause are also not implicated as it primarily concerns only testimonial hearsay, see Crawford v. Washington, 541 U.S. 36, 51-52 (2004), and the phone record is non-testimonial, non-hearsay. See id. at 56. Accordingly, a "a clear and unequivocal rule of law" has not been breached, so we will address the defendant's argument only on the ground asserted at trial – that the bill was not the original.

The document admitted at trial was the original fax the victim sent to Sergeant Hopkins, which included a cover page and the call record for her cell phone. The victim identified the documents and said that the cover page was the document she prepared which outlined that she received a call from an unfamiliar number and that an unfamiliar number appeared on her calling record, and the call record was the item sent to her by her phone company. The defendant's contention that the phone record is not the original is without merit because the Tennessee Rules of Evidence provide that "[a] duplicate is admissible to the same extent as an original unless a genuine question is raised as to the authenticity of the original." Tenn. R. Evid. 1003. As such, the trial court did not abuse its discretion in admitting the faxed telephone records into evidence. Moreover, even if the trial court erred, such error was harmless in light of the positive identifications by two witnesses.

### III. Sufficiency

The defendant argues that the evidence is insufficient to sustain his conviction. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2006). Viewed in a light most favorable to the State, the evidence shows that the defendant approached the victim and her two sisters-in-law and demanded the victim's purse. He grabbed the victim's purse, straining her arm, and, at least twice, told her he had a gun. He had his hand under his shirt, and it appeared to the victim that he in fact had a gun. The defendant contends that the proof was insufficient to establish his identity as the robber. In this regard, the victim and Zoe Barrios both identified the defendant as the robber in pretrial photographic arrays, at a preliminary hearing, and again at trial. The victim testified that the defendant "was very close to [her]" when he grabbed her purse and said she "was sure" of her identification. Zoe Barrios testified that she was "absolutely sure" the defendant was the person who stole the victim's purse "[b]ecasue [they] were face to face." The area where the robbery occurred was described as "well-lit," and the incident lasted "two, three minutes." It was the jury's prerogative both to accredit the victim and Zoe Barrois' identification testimony and to reject the defendant's alibi defense. See State v. Cate, 746 S.W.2d 727, 729 (Tenn.

Crim. App. 1987). We conclude that the evidence was sufficient for a rational jury to convict the defendant of robbery.

As part and parcel of this issue, the defendant additionally argues, for the first time in his reply brief, that the photographic identification was conducted in an unduly and impermissibly suggestive manner. We note that he did not file a pretrial motion to suppress the photographic identification, make a contemporaneous objection at trial, raise the issue in his motion for new trial, or mention it in his initial appellate brief. The defendant has waived review of this issue, and we discern no plain error in the photographic identification procedure. See Tenn. R. Crim. P. 52(b).

## IV. Sentencing

The twenty-one-year-old defendant testified at the sentencing hearing that his mother withdrew him from school in the eighth grade at the age of seventeen and that he had been designated a slow learner since the second grade. He said that he can understand and remember things quickly; his disability is with learning. The defendant said that he receives disability benefits, and that although he is physically able to work, "[he] know[s] if [he] do[es] get a job, they [are] going to cut disability off." He gained employment through a temporary agency on approximately four occasions but was fired "every time they [did a] background check." He does miscellaneous yard work at times. The defendant admitted that he started smoking marijuana at the age of twelve and that he had smoked daily until his trial. He maintained that he was not involved in the robbery.

At the conclusion of the hearing, the trial court sentenced the defendant to the minimum for a Class C felony, three years, suspended after service of six months, followed by three years of probation.[3] The defendant argues that the trial court imposed an excessive sentence because he was not granted full probation or diversion.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record "with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2006). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

---

[3] The defendant's probation order erroneously states that his sentence and probationary term are four years, respectively. However, it is clear from the transcript and the judgement that three years is the correct term for both.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2006); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2006), Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

A defendant who receives a sentence of ten years or less is eligible for probation, subject to certain exceptions. Tenn. Code Ann. § 40-35-303(a) (2006). Even if eligible, however, the defendant is not automatically entitled to probation as a matter of law. See Tenn. Code Ann. § 40-35-303(b). The burden is on the defendant to show the denial of probation was improper. Id.; see also State v. Summers, 159 S.W.3d 586, 599-600 (Tenn. Crim. App. 2004) (citing Ashby, 823 S.W.2d at 169); State v. Baker, 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997) (stating that "[a] criminal defendant seeking full probation bears the burden on appeal of showing the sentence actually imposed is improper, and that full probation will be in both the best interest of the defendant and the public").

There is no bright line rule for determining when a defendant should be granted probation. State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995), overruled on other grounds by Hooper, 29 S.W.3d at 9-10. Every sentencing decision necessarily requires a case-by-case analysis. Id. Factors to be considered include the circumstances surrounding the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). Another appropriate factor for a trial court to consider in determining whether to grant probation is a defendant's credibility or lack thereof, as this reflects on the defendant's potential for rehabilitation. Id. Also relevant is whether a sentence of probation would unduly depreciate the seriousness of the offense. See State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997); Bingham, 910 S.W.2d at 456.

Tennessee Code Annotated section 40-35-313 provides that, following a determination of guilt by plea or by trial, a trial court may, in its discretion, defer further proceedings and place a qualified defendant on probation without entering a judgment of guilt. Tenn. Code Ann. § 40-35-313(a)(1)(A) (2006). A qualified defendant is one who is found guilty or pleads guilty or nolo contendere to a misdemeanor or Class C, D, or E felony; has not been previously convicted of a felony or a Class A misdemeanor; and who is not seeking deferral for a sexual offense, a violation of Tennessee Code Annotated sections 71-6-117 or 71-6-119, or a Class A or B felony. Id. § 40-35-313(a)(1)(B)(i). If the defendant successfully completes the period of probation, the trial court is required to dismiss the proceedings against him, and the defendant may have the records of the proceedings expunged. Id. § 40-35-313(a)(2), (b).

The decision to grant or deny a qualified defendant judicial diversion lies within the sound discretion of the trial court. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); State v. Cutshaw, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997); Bonestel, 871 S.W.2d at 168. As such, it will not be disturbed on appeal absent an abuse of discretion. Electroplating, 990 S.W.2d at 229; Cutshaw, 967 S.W.2d at 344; Bonestel, 871 S.W.2d at 168. To constitute an abuse of discretion, the record must be devoid of any substantial evidence in support of the trial court's decision. Cutshaw, 967 S.W.2d at 344; Bonestel, 871 S.W.2d at 168; State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992).

In determining whether to grant diversion, the trial court considers (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, (f) the deterrence value to the accused as well as others, and (g) whether judicial diversion will serve the interests of the public as well as the accused. Electroplating, 990 S.W.2d at 229; Bonestel, 871 S.W.2d at 168. A trial court should not deny judicial diversion without explaining the factors in support of its denial, and how those factors outweigh other factors in favor of diversion. Electroplating, 990 S.W.2d at 229.

In his brief, the defendant asserts that the trial court erred in denying him full probation or diversion. He submits that the court did not properly assess his potential for rehabilitation, that the evidence did not rebut his statutory favorable candidacy for an alternative sentence, and that the sentence imposed was not the "least severe measure necessary to achieve the purpose for which the sentence was imposed." In his reply brief, the defendant elaborates with regard to full probation that this offense was no more severe than "any other purse snatching" and there was insufficient proof that a weapon was used. He asserts that the court should have taken into account that he had no prior criminal convictions or failed past rehabilitation efforts. He elaborates with regard to diversion that his lack of a prior record, mental slowness, and youth at the time of the offense make him a good candidate for diversion and argues that the court failed to consider all relevant diversion factors.

In sentencing the defendant, the trial court discussed the principles of sentencing and sentencing considerations and then found, in detail, as follows:

> The defendant's physical or mental condition and social history. The Court finds, although the defendant receives a check from the federal government for slow learning, does not appear that he is unable to work. He chooses not to work so he won't lose his free check and his free money. He's not in school. He doesn't show a whole lot of socially redeeming values, so I don't find that those are factors weighing in his favor for probation.

> The facts and circumstances surrounding this offense, and the nature and circumstances of the criminal conduct involved. This was an offense that involved at least the threat of a weapon, whether there was actually a weapon present or not, the victims were placed in great fear. They felt that there was a weapon. They were

terrorized by this defendant and an unknown co-defendant, and in this Court's opinion, preying on these three women, under the nature and circumstances under which they were preyed upon, in the downtown streets of this community is a very serious, serious offense, and weighs against [the defendant] being placed on probation.

He has no prior history of criminal convictions or criminal behavior.

His actions and his character, again, I don't find anything in the report that indicates anything that is advantageous about [the defendant's] character. To the contrary, he smokes marijuana regularly and stopped most recently as soon as we finished our trial. So he has been clean for a month now, but he admits smoking marijuana and has up until the last thirty days. So I find those character flaws do not weigh in favor or probation.

Would he be reasonably expected to be rehabilitated, the potential for rehabilitation. I'm not sure that I'm convinced that that is a factor that weighs in favor of [the defendant] in light of his testimony today and the overwhelming proof, in this Court's opinion, of the positive identification of this defendant as one of the robbers involved in this case. I'm not sure that [the defendant] has accepted his responsibility at this point; therefore, I'm not sure that he has the potential for rehabilitation.

Whether or not it reasonably appears that the defendant will abide by the terms of probation, I don't have anything that indicates to me that he would not, other than his need for smoking marijuana, but I don't have anything that would indicate that he couldn't have followed the rules if I set them out for him.

Whether or not the interest[s] of society are being protected from possible future criminal conduct of the defendant, right now I don't have anything in front of me.

Whether or not a sentence of full probation would unduly depreciate the seriousness of the offense, in this Court's opinion, it would. This is a very serious crime. Robbery, street robbery. Again, whether or not a weapon was present or not, the victims were led to believe a weapon was present, and they were placed in great fear. It is a very serious problem that we have in this community of these kind of street robberies, in this Court's opinion, full probation would unduly depreciate the seriousness of that offense.

Whether or not confinement is particularly suited to provide an effective deterrent to others likely to commit similar offenses. In this Court's opinion, confinement is particularly suited to provide an effective deterrent to others likely to

-13-

commit similar offenses. There's somebody out there -- I suspect I know who that somebody is but the jury felt differently -- that committed this offense along with [the defendant]. To provide a deterrent to not only that individual but to the other individuals who know [the defendant] and to [the defendant], and to others who are familiar with the facts of this case, this Court is of the opinion that confinement is particularly suited to provide a deterrent. And that out and out probation, complete and full probation, would not be a deterrent to others likely to commit this offense. It would send absolutely the wrong message.

In addition, when specifically addressing diversion, the trial court stated that it was "not satisfied from the testimony today that [the defendant] has been truthful in all of this testimony." The court concluded that the defendant's character called into question his suitability for diversion. The court noted that this was a serious offense, involving out-of-town visitors "walking the streets after visiting our city." The court concluded that some relief was necessary, given the defendant's age and lack of a criminal record, and sentenced the defendant to three years, suspended after service of six months, followed by three years of probation.

The lengthy excerpt above clearly shows that the trial court examined all relevant factors and sentencing considerations and, therefore, is entitled to a presumption of correctness. Even though the defendant asserts that the trial court did not fully examine all of the factors relevant to diversion, we note that judicial diversion is a form of probation, see Tenn. Code Ann. § 40-35-313(a)(1)(A); thus, we read the trial court's findings regarding the defendant's suitability for full probation to apply equally to its decision regarding the defendant's suitability for judicial diversion. See State v. Vivian Braxton, No. W2004-02506-CCA-R3-CD, 2005 WL 3059435, at *9 n.4 (Tenn. Crim. App. Nov. 10, 2005), perm. to appeal denied (Tenn. Mar. 20, 2006).

The facts of the case were serious, given the proof likely would have sustained a conviction for *aggravated* robbery. The defendant has a poor work and social history, including daily marijuana use. The court did not find the defendant's testimony truthful and questioned his potential for rehabilitation based on his testimony and failure to accept responsibility. See State v. Zeolia, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996); Anderson, 857 S.W.2d at 574. The court noted that confinement would be a deterrent to the defendant and others likely to commit this type of offense and that full probation or diversion would "greatly undermine the serious nature of [the] offense and would . . . send the wrong message to [the defendant] . . . [and] to many others." In sum, the record fully supports the trial court's determinations, and we conclude that the defendant has failed to prove that the denial of full probation was improper or that the trial court abused its discretion in denying diversion.

## V. Cumulative Error

The defendant argues that he is entitled to relief due to cumulative error at trial. Having found no errors committed by the trial court, we respectfully disagree.

## CONCLUSION

Based on the aforementioned authorities and reasoning, we affirm the judgment of the trial court.

_____

ALAN E. GLENN, JUDGE